Elliot Gale (Bar #1119904)
egale@gajplaw.com
Gale, Angelo, Johnson, & Pruett, P.C.
1430 Blue Oaks Blvd., Ste. 250
Roseville, CA 95747
916-290-7778 ph
916-721-2767 fax

Attorney for Plaintiff
Nikki Parzych

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| NIKKI PARZYCH, <br><br> Plaintiff, <br><br> v. <br><br> TRANSUNION, LLC; BANK OF AMERICA, N.A. <br><br> Defendants. | CASE NO. 2:21-cv-00231 <br><br> COMPLAINT FOR DAMAGES: <br><br> 1. Violation of Fair Credit Reporting Act; |

COMES NOW Plaintiff Nikki Parzych, an individual, based on information and belief, to allege as follows:

## INTRODUCTION

1. This case arises under the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b), 15 U.S.C. § 1681e(b), 15 U.S.C. § 1681i(a)(2)(A)), 15 U.S.C. § 1681i(a)(4)), 15 U.S.C. § 1681i(a)(5)(A)).

2. Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's account with Bank of America, N.A.

3. Here, Bank of America, N.A. (hereinafter "BANA") continues to report Plaintiff as an authorized user on a derogatory account where Plaintiff is not in fact an authorized user after Plaintiff disputed this account with TransUnion, LLC.
4. Instead of removing the derogatory account entirely from Plaintiff's credit report BANA continues to report the account delinquent and Plaintiff an authorized user on the account to TransUnion and is reporting the account as charged off.
5. TransUnion's report reflects an adverse account that should not appear on Plaintiff's credit report whatsoever. Such reporting is wholly inaccurate, misleading, and adversely impacts Plaintiff's credit worthiness.
6. The BANA tradeline at issue has been disseminated to various third parties.
7. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system.
8. Creditors know that by deviating from recognized credit reporting standards consumers will have difficulty raising their credit scores and improving their credit worthiness.

## JURISDICTION & VENUE

9. Plaintiff re-alleges and incorporates herein by this reference the allegations in each and every paragraph above, fully set forth herein.
10. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and 1367, and 15 U.S.C. § 1681
11. This venue is proper pursuant to 28 U.S.C. §1391(b)(1).

## GENERAL ALLEGATIONS

12. Plaintiff alleges that each and every Defendant is familiar with credit reporting industry standards and subscribes thereto.
13. Plaintiff alleges that each and every Defendant understands that deviation from credit reporting industry standards can and often does result in denial of credit, higher interest rates, and prompts those making credit decisions to draw a more negative inference

from the reported data than if the Defendant reported in accordance with the recognized industry standard.

14. Plaintiff alleges that all actions alleged herein by Defendants were done knowingly, intentionally, and in reckless disregard for credit reporting industry standards in an attempt to purposefully undermine Plaintiff's attempt to improve her FICO Score.

15. In the alternative Plaintiff alleges that each and every Defendant's actions was the result of reckless policies and procedures that inevitably led to inaccurate, misleading, or incomplete credit reporting.

**FICO, Inc.**

16. FICO is a leading analytics software company with its principal headquarters located in San Jose California. FICO has over 130 patents related to their analytics and decision management technology, and regularly uses mathematical algorithms to predict consumer behavior including credit risk.

17. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent of lending decisions.

18. A FICO score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

19. Base FICO Scores range from 300 to 850, while industry-specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

20. Different lenders use different versions of FICO Scores when evaluating a consumer's credit worthiness.

21. There are 28 FICO Scores that are commonly used by lenders.

22. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies (CRAs).

23. The three largest CRAs are Experian Information Solutions, Inc.; Equifax, Inc. and Transunion, LLC.

24. FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models or algorithms are based on the premise that information

3

provided by the CRAs is accurate and complies with credit reporting industry standards.

25. There are five key factors that a FICO Score considers: 1) Payment History 2) Amount of Debt 3) Length of Credit History 4) New Credit and 5) Credit Mix.
26. Each of the five factors is weighted differently by FICO.
27. 35% of a consumer's FICO Score relates to payment history, 30% relates to the amount of debt, 15% relates to the length of credit history, 10% relates to new credit, and the last 10% relates to a consumer's credit mix or the different types of debts reported.
28. Payment history refers to whether a consumer has paid their bills in the past, on time, late or missed payments. The more severe, recent, and frequent the late payment information, the greater the impact on a FICO Score. Public record items such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.
29. In factoring the severity of delinquent payments a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.
30. Once a delinquent account has been remedied the longer the account stays current the more a consumer's FICO Score should increase.
31. FICO Scores are entirely dependent upon information provided by data furnishers (DFs) to CRAs.
32. A consumer's FICO score is negatively impacted when an adverse authorized user account is reported making the consumer a higher credit risk.

**Metro 2**

33. The Consumer Data Industry Association is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening and collection service industries.
34. The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by the CDIA in an effort to universally report debts in a particular manner that is understood to be the most accurate way in which to report a debt. Specifically, Metro 2 format was designed to

4

allow reporting of the most accurate and complete information on consumer's credit history.

35. The CDIA's Metro 2 format is the credit reporting industry standard for accurate credit reporting.
36. The credit reporting industry at large depends upon Metro 2 and the CDIA's recommendations for reporting debt accurately.
37. The CDIA is *The* expert on accurate credit reporting. In support of this allegation Plaintiff avers the following:
    a. The CDIA offers a FCRA certificate program for all CRAs.
    b. The CDIA offers a FCRA awareness program for all CRAs.
    c. The CDIA offers a FCRA Certificate program for DFs.
    d. The CDIA offers a FCRA awareness program for DFs.
    e. The CDIA offers a Metro 2 Learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 Format as well as the relationship between multiple fields.
    f. The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and Transunion.
    g. The CDIA developed a credit reporting resource guide for accurately reporting credit.
38. The CDIA's Metro 2 is accepted by all CRAs.
39. The credit reporting accepted industry standards for reporting Metro 2 accurately are found in the CDIA's credit reporting resource guide (CRRG).
40. The CRRG outlines the industry standards for most accurately reporting debts using Metro 2.
41. The three main credit bureaus helped draft the CRRG.
42. The CRRG is not readily available to the public. It can be purchased online for $229.45.
43. Even if a buyer is ready willing and able to pay for the CRRG, the CDIA will NOT grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.

44. When FICO calculates credit scores the algorithms use Metro 2 information based on industry standards established by the CDIA.
45. The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.
46. If the Metro 2 data received by FICO deviates from industry standards an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower a consumer will be considered a higher credit risk resulting in less favorable lending terms.

### e-OSCAR

47. E-OSCAR is the web based Metro 2 compliant system developed by Experian Information Solutions, Inc.; Equifax, Inc.; TransUnion, LLC and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.
48. When a consumer sends a dispute letter to a CRA the CRA then sends an automated credit dispute verification (ACDV) via e-Oscar to the DF.
49. The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g. "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

### Plaintiffs Dispute

50. On June 11, 2020 Plaintiff ordered a three bureau credit report from Experian, TransUnion, and Equifax to ensure proper reporting by Plaintiff's creditors.
51. Plaintiff received a chapter 7 bankruptcy discharge in April of 2020 and was verifying her post-discharge credit report to confirm her creditors correctly updated all the accounts included/discharged in her bankruptcy filing.
52. Plaintiff noticed a delinquent and adverse trade line on her June 11, 2020 credit report where she was listed as an authorized user on a BANA account.
53. Plaintiff did not believe she was an authorized user on any BANA account as she had her own BANA account that was included in her bankruptcy discharge.
54. In response, Plaintiff disputed the BANA trade line via certified mail with Experian, Equifax, and TransUnion.
55. Plaintiff's dispute letter specifically put defendant BANA on notice that she was not an authorized user on the BANA account and to the extent Plaintiff was ever an authorized user on the account she was revoking her authorized user status on the BANA account

and that she would like her name removed as an authorized user and the account deleted from her credit report.

56. Plaintiff also requested that her dispute letter be forwarded to BANA in order for the account to be updated and removed from her credit report.

57. Plaintiff's dispute letter also made clear that given Plaintiff's dispute letter the Bureaus had first-hand knowledge that Plaintiff was no longer in fact an authorized user on the account and should delete the account or otherwise remove it from her credit report.

58. Plaintiff is informed and believes that each CRA received Plaintiff's dispute letter and in response sent Plaintiff's dispute to each DF via an ACDV through e-OSCAR.

59. On August 19, 2020 after the statutory time period had elapsed for Plaintiff to receive a reinvestigation report from the credit Bureaus, Plaintiff ordered a second credit report for the sole purpose to ensure Plaintiff's accounts had in fact been updated.

**Inaccuracy – BANA**

60. Plaintiff was frustrated to see that Defendant BANA did not properly update the account.

61. Instead, BANA continued to report that Plaintiff an authorized user on an adverse account despite Plaintiff factually not being an authorized user on the account.

62. BANA's reporting is harming Plaintiff's credit score as the tradeline at issue indicates that the account is charged-off – implying that Plaintiff is a credit risk and still liable for the balance.

63. The reporting was updated by Bank of America after Plaintiff's bankruptcy filing.

64. BANA did not delete or update the account in response to Plaintiff's bankruptcy filing/discharge and her post-discharge dispute letter.

**Willfulness**

65. This was not a negligent act by Defendant BANA but instead an intentional act to purposefully undermine Plaintiff's ability to effectively restore Plaintiff's credit.

66. BANA's reporting makes Plaintiff appear less credit worthy because the delinquent payments of the actual cardholder are impacting Plaintiff's credit report.

7

67. Rather than properly deleting the account from Plaintiff's credit reports, BANA continued to report credit mistakes negatively impacting Plaintiff's credit worthiness and score.

68. BANA's reporting makes it appear that Plaintiff still owes money on the charged-off account as there is no reference to any bankruptcy discharge anywhere on the BANA tradeline.

69. To the extent that Plaintiff was not an authorized user, BANA should have reported Plaintiff's bankruptcy discharge for the account.

70. Such a scheme directly undermines the integrity of the credit reporting system at large.

**Damages**

71. As a result of the incorrect reporting, Plaintiff has suffered economic loss, diminished credit, and emotional harm.

72. Various third parties have reviewed Plaintiff's credit report.

73. Plaintiff credit score is lower than it otherwise would be if BANA were not reporting the tradeline at issue, making it difficult for Plaintiff to rebuild her credit and subject Plaintiff to extremely high interest rates that would otherwise be lower if BANA was not reporting inaccurate account information on her credit report.

74. The actions of TransUnion and BANA as alleged herein are acts in violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

**FIRST CAUSE OF ACTION**
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))
Against Defendant TransUnion)

**TransUnion, LLC– Failure to Assure Credit Reporting Accuracy.**

75. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

76. TransUnion violated 15 U.S.C. § 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and credit files it published and maintained concerning Plaintiff.

77. Had TransUnion maintained reasonable procedures to assure maximum accuracy TransUnion would never have allowed Defendant BANA to report the account as described herein. Instead, the account at issue would simply been removed from Plaintiff's credit report.
78. As a result of TransUnion's violation of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: diminished credit, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

### Willfulness

79. The violations described herein by TransUnion were willful, specifically the TransUnion has intentionally and purposefully set up a system where inaccuracies are not only probable but inevitable.
80. In 2012 the FTC reported that 1 in 5 consumer credit reports contains a material error.
81. Such a finding should shock the conscience.
82. When those errors are disputed TransUnion intentionally send consumer disputes to employees who do not live within the continental United States.
83. This is intentionally done to hide and or subvert a consumer's ability to confront individual directly responsible for approving accurate reporting.
84. Such a policy also inevitably leads to disputed going unresolved as these employees for Defendants TransUnion receive little to know training concerning how to accurately report consumer debt.
85. Instead, these employees are simply instructed to parrot whatever information a data furnisher provides regardless of whether that information is accurate. *See Saez v. Trans Union,* LLC, 621 F.Supp. 2d 1074, 1083, 1088 (D.Or. 2007); *Grigoryan v. Experian Info. Sols.*, Inc., 84 F. Supp. 3d 1044, 1091 (C.D. Cal. 2014); *Haykuhi Avetisyan v. Experian Info Sols.*, No. CV 14-05276-AB (ASX)
86. TransUnion employees are regularly expected to review and approve over 90 disputes per day rendering less than five minutes to review, investigate, and respond to each dispute received.
87. TransUnion has intentionally setup this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

88. TransUnion also allowed BANA to report its account with inaccurate information despite specifically being told in the dispute letter why the information BANA was reporting was incorrect.

89. TransUnion knew plaintiff was not an authorized user yet did not delete the account from Plaintiff's credit reports after receiving Plaintiff's dispute letter.

90. Given that TransUnion helped draft the CRRG, and Plaintiff specifically referenced industry guidelines in the dispute letter TransUnion knew that these accounts were not reporting in a manner consistent with industry standards i.e. accurate, but chose to do nothing.

91. Consequently, Defendant TransUnion is liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n. In the alternative TransUnion was at least negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

92. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from TransUnion in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**SECOND CAUSE OF ACTION**
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681s-2(b))
Against Defendant TransUnion and BANA)

**BANA – Failure to Reinvestigate.**

93. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

94. 15 USC 1681s-2(b) and 15 USC 1681i-(a)1 prohibits furnishers from providing any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate or misleading and requires a furnisher to update and or correct inaccurate information after being notified by a consumer reporting agency of a dispute by a consumer.

95. Defendant BANA violated section 1681s-2(b) by failing to conduct a reasonable investigation and re-reporting misleading and inaccurate account information.

96. The CRAs provided notice to BANA that Plaintiff was disputing the inaccurate and misleading information but BANA failed to conduct a reasonable investigation of the information as required by the BANA.
97. Based on Plaintiff's dispute, BANA should have known that to the extent Plaintiff was ever an authorized user on the account Plaintiff was no longer an authorized user and the account should have been removed from Plaintiff's credit report.
98. The most basic investigation would simply involve reading Plaintiff's dispute and unequivocally seeing that Plaintiff was no longer an authorized user on the account.
99. Plaintiff alleges BANA did not review well established industry standards for credit reporting.
100. If BANA had reviewed such standards BANA would have seen its reporting was not in compliance and consequently inaccurate and or incomplete.
101. The lack of investigation is unreasonable.
102. Plaintiff further alleges that BANA has not properly trained those directly investigating disputes on Metro 2 generally or credit reporting industry standards and as such have developed reckless policies and procedures.

**TransUnion, LLC – Failure to Reinvestigate Disputed Information.**

103. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.
104. After Plaintiff disputed the accounts mentioned above, TransUnion was required to conduct a reasonable investigation and to delete any information that was not accurate under 15 USC 1681i-(a)1.
105. TransUnion failed to conduct a reasonable investigation and failed to correct the misleading and or inaccurate statements on the account within the statutory time frame or at all.
106. Plaintiff alleges that TransUnion has its own independent duty to conduct a reasonable investigation 15 USC 1681i-(a)1.
107. Equifax is not a passive entity bound to report whatever information a DF provides.
108. Plaintiff alleges that TransUnion is readily familiar with Metro 2 guidelines and credit reporting industry standards given that Equifax helped draft said guidelines.

109. Given the aforementioned, Plaintiff alleges that TransUnion can and does suppress inaccurate information from being reported when DFs provide inaccurate information.

110. TransUnion can and does instruct DFs on how to properly report certain accounts from time to time upon request from the DF.

111. TransUnion failed to conduct a reasonable investigation because any basic investigation would have included a review of Plaintiff's dispute letter which unequivocally asserted Plaintiff's desire to no longer be an authorized user and to remove the account from Plaintiff's credit file.

112. TransUnion would have known that Plaintiff revoked her authorized user status based on the explicit information in her dispute letter.

113. TransUnion therefore did not do the most basic investigation regarding credit reporting industry standards otherwise the aforementioned would have been uncovered.

114. TransUnion intentionally, willfully or with reckless disregard for Plaintiff's accuracy did no investigation whatsoever given that TransUnion general policy is to simply parrot whatever information a data furnishers sends.

115. Such policy and procedure inherently leads to inaccurate information being reported and therefore such an investigation is wholly unreasonably and reckless i.e. willful.

### THIRD CAUSE OF ACTION
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))
Against Defendant TransUnion)

**TransUnion, LLC – Failure to Review and Consider All Relevant Information.**

116. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

117. TransUnion violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

118. As a result of TransUnion's violation of 15 U.S.C. § 1681i(a)(4), Plaintiff suffered actual damages, including but not limited to, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

119. The violations by TransUnion were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.

120. In the alternative, TransUnion was negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

121. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from TransUnion in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## FOURTH CAUSE OF ACTION
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))
Against Defendant TransUnion)

**TransUnion, LLC – Failure to Delete Disputed and Inaccurate Information.**

122. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

123. TransUnion violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

124. As a result of TransUnion's violation of 15 U.S.C. § 1681i(a)(5)(A), Plaintiff suffered actual damages, including but not limited to, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

125. The violations by TransUnion were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.

126. In the alternative, TransUnion was negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

127. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from TransUnion in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1. For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;
2. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;
3. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;
4. Award attorney's fees and costs of suit incurred herein pursuant to 15 U.S.C. § 1681n & o;
5. For determination by the Court that Creditor's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, et seq.; and
6. For determination by the Court that Creditor's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

Gale, Angelo, Johnson, & Pruett, P.C.

Dated: February 22, 2021

*/s/ Elliot Gale*
Elliot Gale (Bar #1119904)
egale@gajplaw.com
Gale, Angelo, Johnson, & Pruett, P.C.
1430 Blue Oaks Blvd., Ste. 250
Roseville, CA 95747

Attorney for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial of this matter by jury.

Gale, Angelo, Johnson, & Pruett, P.C.

Dated: February 22, 2021

*/s/ Elliot Gale*
Elliot Gale
Attorney for Plaintiff